**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LINDA A. LEENSTRA, ) | Civil Action No.: 10-5909 (JLL) |
| ) | |
| Plaintiff, ) | **OPINION** |
| ) | |
| v. ) | |
| ) | |
| RICHARD THEN, BRIAN KITHCART, ) | |
| PHILLIP COLEMAN, ANDOVER ) | |
| TOWNSHIP, JOHN DOE 1-10 (A ) | |
| FICTITIOUS NAME), JOHN ROE ) | |
| SUPERVISING OFFICER 1-10 (A ) | |
| FICTITIOUS NAME), ABC CORP. 1-10 ) | |
| (A FICTICIOUS NAME), ) | |
| ) | |
| Defendants. ) | |

**LINARES**, District Judge.

This matter comes before the Court by way of a Motion for Summary Judgment filed by

Richard Then, Brian Kithcart, Phillip Coleman, and Andover Township (collectively

"Defendants") on November 12, 2012. The Court has considered the submissions of the parties

in support of and in opposition to the present motion[1] and decides this matter without oral

argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons that

follow, Defendants' motion is granted.

---

[1] The Court also considered Linda A. Leenstra's February 14, 2013, letter to the Court notifying
the Court that the "MOST important fact of this case seems to be missing from all briefs
[Plaintiff's attorney] has presented.  *That fact being that [Plaintiff] was falsely arrested while
[she] was simultaneously being 'involuntarily committed' during a mental health 'welfare
check.'"  Docket Entry No. 64 (emphasis in original).

I.      **BACKGROUND**

Linda A. Leenstra ("Plaintiff") has a history of mental illness and has been diagnosed

with Borderline Personality Disorder, Bipolar Disorder, Massive Depressive Disorder, and

Generalized Anxiety Disorder. Defs. Statement of Facts ("SOF") at ¶¶ 9-10. Plaintiff was

hospitalized for "mental health emergencies" on three occasions prior to November 14, 2008.

Defs. SOF at ¶ 11. On one of these occasions, Plaintiff was involuntarily committed and on a

second occasion she was taken to the hospital by police and kept "overnight for observation."

Defs. SOF at ¶¶ 13-15.

On November 14, 2008, at approximately 7:50 PM, Plaintiff's therapist, Sheri Gibson

("Gibson") received a text from Plaintiff that read, "Do you think today's a good day to die? I

do." Defs. SOF at ¶ 19. Gibson called Plaintiff and left a voicemail stating that if Plaintiff "did

not return Gibson's call within fifteen minutes, Gibson would call the police." Defs. SOF at ¶

22. Plaintiff did not return this call, and, at 9:01 PM, Gibson called a police dispatcher to notify

the dispatcher that Plaintiff "sent a text message that was suicidal in nature." *See* Defs. SOF at ¶

23. Gibson requested a welfare check and provided the dispatcher with Plaintiff's number.

Defs. SOF at ¶¶ 23-24.

The dispatcher unsuccessfully attempted to call Plaintiff. *See* Defs. SOF at ¶ 24.

Meanwhile, Andover Police Officers Richard Then ("Officer Then") and Brian Kithcart

("Officer Kithcart") went to Plaintiff's home to perform the requested welfare check, but no one

was there. Defs. SOF at ¶ 27. Shortly thereafter, Gibson successfully contacted Plaintiff's

husband ("Mr. Leenstra") and learned that Plaintiff was attending an event at Sussex County Vo-

Tech High School. Defs. SOF at ¶ 24. Gibson relayed this information to the police dispatcher.

2

*See* Defs. SOF at ¶ 25.  The police dispatcher contacted the Sparta police dispatcher and asked the Sparta police to conduct a welfare check on Plaintiff.  Defs. SOF at ¶ 29.

Before the police arrived, Plaintiff left.  Defs. SOF at ¶ 30.  Plaintiff stated, in response to an interrogatory, that she was "very upset and paranoid" after the dispatcher contacted her husband and demanded that Mr. Leenstra take her home.  Pl. Resp. to Defs. SOF at ¶ 26.  Plaintiff now explains that this interrogatory answer was incorrect and that she actually left because she "she felt the police were probably going to show up at the Vo-Tech and she did not want to embarrass her . . . friends and family" at the school.  *See* Pl. Resp. to Defs. SOF at ¶ 26.  When the Sparta Police arrived at the school, they called Plaintiff's husband and were told that she was already home and was "fine."  Defs. SOF at ¶ 30.  The Sparta police informed the dispatcher, who then told Officer Then and Officer Kithcart.  Defs. SOF at ¶ 31.

Officer Then and Officer Kithcart returned to Plaintiff's home.[2]  Defs. SOF at ¶ 32.  The officers knocked on Plaintiff's door and entered the home.  Defs. SOF at ¶¶ 36-38.  Mr. Leenstra greeted them and indicated that everything was "fine."  Defs. SOF at ¶ 39.  Officer Then and Officer Kithcart explained that they still needed to speak with Plaintiff.  Defs. SOF at ¶ 39.  Officer Then asked Plaintiff, who was standing in the hallway at that time, "[w]hat's up with the text message?"  Defs. SOF at ¶ 41.  Plaintiff explained that she was "fucking pissed" and returned to her bedroom.  Defs. SOF at ¶ 41.

Officer Then explained to Mr. Leenstra that the officers needed to talk to Plaintiff and then followed Mr. Leenstra into Plaintiff's bedroom.  Defs. SOF at ¶¶ 43-44.  Mr. Leenstra informed Plaintiff that the officers needed to speak with her, and Plaintiff responded, "I'm fine!

---

[2] Officer Then "was equipped with a recorder that recorded audio over the course of the next hour in the Leenstra residence." Defs. SOF at ¶ 33.  Defendants attached a copy of the audio recording to their Motion for Summary Judgment.

I'm here! . . . What's next?  It'll be illegal to wipe my ass.  Get the fuck out." Defs. SOF at ¶¶

45-46.  Officer Then calmly asked Plaintiff again "[w]hat's with your text message that you

sent?," and she responded, "[w]hy the fuck do you think I would say that?  Get out!" Defs. SOF

at ¶¶ 48-51.  Officer Then explained to Plaintiff that they could either "go the easy route or [he]

can call a rig." Defs. SOF at ¶ 52.  Officer Then called Emergency Medical Services ("EMS")

and requested an ambulance. Defs. SOF at ¶ 54.  He explained that he was calling an ambulance

because Plaintiff made a threat on her life. Defs. SOF at ¶ 55.  Plaintiff became "irate" and

screamed "[l]eave me alone!" several times. Defs. SOF at ¶ 56.

Plaintiff then grabbed her coat from the foot of the bed and moved towards the door.

Defs. SOF at ¶ 57.  Officer Then interpreted Plaintiff's actions as a possible attempt to exit the

home and grabbed her arm to stop her. Defs. SOF at ¶ 59.  Plaintiff alleges that "she was

reaching for her coat to retrieve her cell phone to call her therapist." Pl. Resp. to Defs. SOF at ¶

59.  The audio recording of the events that evening "breaks up" in spots, but, from the

conversation that can be deciphered, there is no mention of a cell phone or therapist. Defs. SOF

at ¶ 60.

When Officer Then grabbed Plaintiff, Plaintiff struggled, and Officer Then and Plaintiff

fell to her bedroom floor. Defs. SOF at ¶ 61.  Plaintiff continued to struggle for the next few

minutes and was verbally and physically uncooperative. Defs. SOF at ¶ 62.  Officer Then and

Officer Kithcart complained about being kicked at various times throughout the incident. Defs.

SOF at ¶ 64.  On the audio recording, one of the officers is heard stating, "stop kicking me."

Defs. SOF at ¶ 63.  In an effort to secure Plaintiff, Officer Then and Officer Kithcart pushed her

against the wall and attempted to handcuff Plaintiff. Defs. SOF at ¶ 65.  Plaintiff pushed back,

knocking Officer Then to the floor. Defs. SOF at ¶ 67.  Plaintiff then screamed that the officers

were "breaking" her shoulder as they continued to try to handcuff her.[3]   Defs. SOF at ¶ 68.   The

officers were eventually able to secure Plaintiff using two sets of handcuffs, "which were

necessary due to her size."   Defs. SOF at ¶ 70.

After restraining Plaintiff, Officer Then and Officer Kithcart moved her from the

bedroom towards the front of the house.   Defs. SOF at ¶ 71.   In the process, Plaintiff kicked

Officer Kithcart in the groin and Officer Then in the interior left knee and lower leg.[4]   Defs. SOF

at ¶ 71.   Plaintiff remembered Officer Kithcart accusing her of kicking him.   Defs. SOF at ¶ 72.

Plaintiff explained that she was forced to move very quickly, was hopping on one leg at the time,

and may have inadvertently struck the officers.   Pl. Resp. to Defs. SOF at ¶ 71.   Officer Then and

Officer Kithcart then informed Plaintiff that she was under arrest for assaulting a police officer.

Defs. SOF at ¶ 75.

Shortly thereafter, Plaintiff's neighbor Debbie Reidmiller ("Reidmiller"), an EMS

worker, arrived at the scene.   Defs. SOF at ¶ 77.   Plaintiff asked Reidmiller about removing

Plaintiff's handcuffs, and Reidmiller relayed this message to Officer Then and Officer Kithcart.

Defs. SOF at ¶ 78.   The officers denied Plaintiff's request, but, within three minutes of the

request, moved her handcuffs to a more comfortable position in the front of Plaintiff's body.

Defs. SOF at ¶ 78.

---

[3] Plaintiff had a "pre-existing shoulder tendonitis."   Defs. SOF at ¶ 69.   Then and Kithcart did
not know about this condition at the time of Plaintiff's arrest, and Plaintiff never mentioned it to
either officer.   Defs. SOF at ¶ 69.
[4] Officer Then and Officer Kithcart's supervising officer, Chief Phillip Coleman ("Chief
Coleman") directed the officers to go to the emergency room to be checked out for injuries.
Defs. SOF at ¶ 75.   A picture of the bruises sustained by one of the officers was attached to
Defendants' motion.   *See* Defs. SOF at ¶ 74.

As Plaintiff was being evaluated by EMS, she struck herself in the face with her handcuffs leaving minor cuts. Defs. SOF at ¶ 79. She continued to make threats against her life. Some of these statements included the following:

- "It's a goddamn fucking good day to go."

- "I want to die. Everyone fucking knows that. I've been walking around for the last three years – I want to die."

- "They give me so many fucking drugs, I don't know what the fuck I'm saying or doing."

- "Does this look like I want to live? Does this look like somebody that wants to live? Is this the way people want to live?"

- "Might as well pull the fucking gun out, pal. That's the easier way to take care of it."

Defs. SOF at ¶ 79.

Plaintiff was taken by ambulance to Newton Memorial Hospital. Defs. SOF at ¶ 80. Once there, Plaintiff was placed in a room and handcuffed to a bed. Defs. SOF at ¶ 82. Plaintiff screamed, grabbed the cord on the call bell, and wrapped it around her neck. Defs. SOF at ¶ 83. The nurses called Officer Then and Officer Kithcart, who were waiting outside the room. Defs. SOF at ¶ 84. Plaintiff was flailing, kicking, and turning purple. Defs. SOF at ¶ 85. Officer Then and Officer Kithcart removed the cord from her neck, and Plaintiff spat on them. Defs. SOF at ¶ 86. Emergency room personnel eventually medicated and restrained Plaintiff. Defs. SOF at ¶ 87. At 4:50 AM, Judge Mulhern of the Andover Municipal Court issued a warrant for Plaintiff's arrest. Defs. SOF at ¶ 88. Upon Plaintiff's release from the hospital at 2:53 AM, a detective placed her in handcuffs and transported her to the county jail. Defs. SOF at ¶ 89. Plaintiff was lodged in the Keogh-Dwyer Correctional Facility in lieu of $20,000 bail and released the next

6

day.  Defs. SOF at ¶ 90.  The charges against Plaintiff were subsequently dropped.  Defs. SOF at ¶ 91.

On November 14, 2010, Plaintiff filed a six count complaint against Officer Then; Officer Kithcart; Chief Coleman; Andover Township; John Doe 1-10, "fictitious persons/law enforcement officers whose identity" was unknown at the time; John Roe Supervising Officers 1-10, fictitious supervising officers in the Andover Township Police Department; and ABC Corp. 1-10, "fictitious names for entities who were responsible of the investigation and/or enforcement of the laws within Andover Township."[5]  Compl. at 2-3.  On October 12, 2012, Defendants filed the present Motion for Summary Judgment requesting judgment in their favor on each of Plaintiff's six counts.

## II.   LEGAL STANDARD

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 744 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial.  *Id.* at 324.  In so presenting, the non-moving party must offer specific facts that establish a

---

[5] Plaintiff did not amend her complaint to identify these fictitious defendants, and Plaintiff's deadline to amend her complaint or add additional parties has passed.  Plaintiff has not presented any evidence of any wrong committed by any fictitious officer or Andover Township entity, and discovery in this matter is closed.  Accordingly, Plaintiff's claims against these fictitious defendants cannot survive summary judgment.  Moreover, even if Plaintiff had identified the fictitious defendants, these defendants would be entitled to summary judgment in their favor for the same reasons set forth below for the named defendants.

7

genuine issue of material fact, not just "some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, the non-

moving party may not rest upon the mere allegations or denials in its pleadings. *See Celotex*,

477 U.S. at 324. Further, the non-moving party cannot rely on unsupported assertions, bare

allegations, or speculation to defeat summary judgment. *See Ridgewood Bd. of Educ. v. N.E. ex.*

*Rel. M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). The Court must, however, consider all facts and

their reasonable inferences in the light most favorable to the non-moving party. *See*

*Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

## III.   DISCUSSION

### A.   Counts One, Two, and Three – Federal and State Constitutional Law Claims

In Counts One, Two, and Three of Plaintiff's complaint, Plaintiff alleges that Officer

Then, Officer Kithcart, Chief Coleman, John Roe Supervising Officer 1-10, and Andover

Township violated the New Jersey State Constitution as well as the Fourth, Fifth, and Fourteenth

Amendments of the United States Constitution. *See* Compl. at 8-12. For the reasons that follow,

Defendants are entitled to summary judgment in their favor as to each of these counts.

#### 1.   Claims Against Officer Then and Officer Kithcart

Defendants argue that Officer Then and Officer Kithcart are entitled to qualified

immunity as to each of Plaintiff's state and federal constitutional law claims against them. Defs.

Br. at 7. Qualified immunity applies to claims under both the United States and the New Jersey

constitutions. *Ramos v. Flowers*, No. A-4910-10T3, 2012 N.J. Super. LEXIS 157, at *14 (N.J.

Super. Ct. App. Div. filed Sept. 21, 2012). Police officers performing discretionary functions are

generally "shielded from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

8

known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts recognize that police officers must often make split second decisions and can make mistakes in the process. *See Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 204-05 (2001)). Accordingly, the qualified immunity afforded to police officers encompasses "mistaken judgments that are not plainly incompetent." *Id.* Whether a police officer's mistake is reasonable and he is thus entitled to qualified immunity is a "question of law that is properly answered by the court, not a jury." *Curley v. Klein*, 499 F.3d 199, 211 (3d Cir. 2007).

Here, Plaintiff alleges numerous violations of the United States and New Jersey constitutions. As Count One, Plaintiff argues that Officer Then and Officer Kithcart violated her federal constitutional rights by detaining her, searching her home, using excessive force, "unjustifiably creating a danger and undue risk to Plaintiff's life and limb," falsely arresting and imprisoning Plaintiff, maliciously prosecuting Plaintiff, and denying Plaintiff "Equal Protection of the Law." *See* Compl. at 9. As Count Two, Plaintiff alleges that the officers deprived her of her "substantive due process, equal protection rights, [and] privileges and/or immunities" secured by the federal and state constitutions. *See* Compl. at 10-11. And, as Count Three, Plaintiff alleges that the officers violated her state constitutional rights by "falsely arresting Plaintiff, illegally seizing the person of Plaintiff, maliciously prosecuting Plaintiff, using excessive force, and conspiring to commit the acts aforesaid." *See* Compl. at 11. For the reasons that follow, Plaintiff's allegations are insufficient to establish a "violation of a constitutional or statutory right," and the officers are entitled to summary judgment in their favor. *See Harlow*, 457 U.S. at 818.

> **a.    Detaining Plaintiff without probable cause**

In Counts One and Three of Plaintiff's complaint, Plaintiff alleges that she was seized and detained without probable cause and in violation of her United States and New Jersey state constitutional rights. *See* Compl. at 9, 11 (stating that Defendants violated Plaintiff's rights by "illegally seizing the person of Plaintiff"). Plaintiff was detained on two separate occasions. First, Officer Then and Officer Kithcart detained her and took her to the hospital for a mental health evaluation. *See* Defs. SOF at ¶ 80. Second, Plaintiff was arrested and taken by Detective Danielson to the county jail. *See* Defs. SOF at ¶¶ 89-90. Officer Then and Officer Kithcart's conduct in each of these detainments does not violate a clear statutory or constitutional right, so each officer is entitled to summary judgment in his favor. *See Harlow*, 457 U.S. at 818.

### i.    Mental Health Evaluation

Officer Then and Officer Kithcart detained Plaintiff for a mental health evaluation. *See* Defs. SOF at ¶ 80. N.J.S.A. § 30:4-27.6 permits a law enforcement officer to take custody of a person and take that person immediately and directly to a screening service if, on the basis of a personal observation, the law enforcement officer has reasonable cause to believe that the person is in need of involuntary commitment to treatment." *See* N.J.S.A. § 30:4-27.6(a); *see also Washington v. Glucksberg*, 521 U.S. 702, 730 (1997) ("The state has an interest in preventing suicides"). A person is in need of treatment if they are mentally ill, the illness causes them to be a danger to themselves, they are unwilling to go for treatment, and other available services will not meet the person's needs. *See* N.J.S.A. § 30:4-27.2(m).

Plaintiff makes two arguments why her detention for a mental health evaluation was improper. First, she argues that Gibson "effectively cancel[ed] the welfare check" when she contacted the police dispatcher to inform the dispatcher that Gibson had spoken with Mr. Leenstra. Pl. Br. at 4. Plaintiff's assertion completely misconstrues the record before the Court,

including that transcript excerpt provided by Plaintiff. *See* Pl. SOF at ¶ 25. That transcript reads as follows:

> Gibson: Actually, I just spoke with [Plaintiff's] husband, they are at a tricky tray.
> Dispatcher: Oh! Okay?
> Gibson: Isn't that nice?
> Dispatcher: Well they just made entrance into the house.
> Gibson: Oh, no.
> Dispatcher: So, let me tell them she's not there. Can you hold a minute?
> Gibson: Yeah.
> Dispatcher: I have the psychologist on the phone. She has been in contact with her and her husband and they are not home, they are at a tricky tray.

Pl. SOF at ¶ 25. No fair reading of this dialogue suggests that the Gibson cancelled the mental health check.[6] *See* Pl. SOF at ¶ 25. She merely relayed Plaintiff's location to the police dispatcher. *See* Pl. SOF at ¶ 25. Moreover, even if this can be construed as a cancellation, Plaintiff has not presented any evidence indicating that this cancellation was ever relayed to Officer Then or Officer Kithcart.

Plaintiff also argues that, even if the mental health evaluation was not cancelled, Officer Then and Officer Kithcart had no "reasonable cause to believe that [Plaintiff was] in need of involuntary commitment to treatment" and thereby violated N.J.S.A. § 30:4-27.6.[7] Pls. Br. at 9-10. This argument is also without merit. The facts before this Court establish that Plaintiff was

---

[6] While at the Sussex Count Vo-Tech, Plaintiff's husband spoke with Gibson and the police dispatcher. Defs. SOF at ¶¶ 24, 28. Although Plaintiff now argues that Gibson and the dispatcher effectively cancelled the mental health evaluation, Plaintiff's argument is not consistent with the facts before the Court. *See* Pl. SOF at ¶ 25. Moreover, Plaintiff acknowledges that, after these phone calls, she still "fully expected" the police to come. Pl. Br. at 4.

[7] Plaintiff also argues that her impairments did not qualify under the "definition of an individual in a Mental Health Emergency" because she was having a reaction to the "many medications she was taking." Pl. Br. at 11. Plaintiff indicates on Then's audio recording that "[t]hey give me so many fucking drugs, I don't know what the fuck I'm saying or doing." Defs. SOF at ¶ 79. However, Plaintiff clearly suffered from a mental health impairment, and as discussed below, there is more than sufficient evidence in the record whereby Then and Kithcart could reasonably conclude she posed a danger to herself.

11

suffering from a mental illness and was unwilling to submit to voluntary treatment. *See* Pl. Br. a

16. Plaintiff made numerous suicidal statements to Officer Then and Officer Kithcart whereby

they could reasonably believe that Plaintiff was a danger to herself and in need of

hospitalization.[8] *See Roberts v. Anderson*, 213 F. App'x 420, 427 (6th Cir. 2007) ("Probable

cause in the context of mental health requires only a showing that there is a probability or

substantial chance of dangerous behavior, not an actual showing of such behavior.").

Accordingly, Officer Then and Officer Kithcart were reasonable in believing they acted in

accordance with Plaintiff's statutory and constitutional rights and are thereby entitled to statutory

immunity for their actions.[9] *See Harlow*, 457 U.S. at 818.

### ii.      Arrest for Assault

After Plaintiff completed her mental health evaluation and was released from the

hospital, she was placed under arrest for assaulting Officer Then and Officer Kithcart. *See* Defs.

SOF at ¶¶ 89-90. Defendants argue that this arrest was properly conducted pursuant to a warrant

issued by Judge Mulhern. Defs. Br. at 16. It is unclear from the record, however, whether the

officers received this warrant before or after the arrest. Defendants' Statement of Facts indicates

that the warrant was issued approximately 2 hours after Plaintiff's arrest. Defs. SOF. at ¶¶ 88-

89. But, Officer Kithcart's report states that Judge Mulhern issued the warrant prior to Plaintiff's

---

[8] Plaintiff acknowledged sending a suicidal text message. *See* Pl. Resp. to Defs. SOF at ¶ 19. Then asked about this message, and Plaintiff explained that she "think[s] it's a good day to die" and that the text is her "fucking opinion." Defs. SOF at ¶ 49. Later, while being evaluated at her home by EMS, Plaintiff made five additional statements that were suicidal in nature, including exclaiming that she "want[s] to die." Defs. SOF at ¶ 79. Accordingly, Officer Then and Officer Kithcart had "reasonable cause" to believe Plaintiff posed a "danger" to herself.
[9] Plaintiff argues that Officer Then and Officer Kithcart violated an Andover Township Standard Operating Procedure ("SOP") by not requesting the services of mental health screeners before taking Plaintiff to the Hospital. Pl. Br. at 7-8. Officer Then and Officer Kithcart are immune for liability to the extent their conduct does not violate "clearly established statutory or constitutional rights." *Harlow*, 457 U.S. at 818. An Andover Township SOP is not a "clearly established statutory or constitutional right." *See id.*

arrest. *See* Kithcart Report at 2. The Court is required to resolve this dispute in favor of the non-moving party. Even in doing so, Plaintiff's arrest was proper. *See Pennsylvania Coal Ass'n*, 63 F.3d at 236. A "warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). There is sufficient evidence in the record demonstrating that Plaintiff spit on Officer Then and Officer Kithcart thereby committing an assault. Defs. SOF at ¶ 86. Plaintiff also acknowledges spitting on Officer Then and Officer Kithcart. *See* Pl. Resp. to Defs. SOF at ¶ 86. Accordingly, Plaintiff fails to prove a constitutional violation, and the officers are entitled to summary judgment in their favor. *See Harlow*, 457 U.S. at 818.

### b.      Searching Plaintiff's property without probable cause

In Count One, Plaintiff alleges that Officer Then and Officer Kithcart violated her constitutional rights by searching her property without probable cause. *See* Compl. at 9. Officer Then and Officer Kithcart entered Plaintiff's home on two occasions to conduct a mental health welfare check—once before she returned home and once after. Defs. SOF at ¶¶ 27, 38. Neither officer had a warrant when entering Plaintiff's home; however, the Fourth Amendment's warrant requirement contains an exception for exigent circumstances. *See Brigham City Utah v. Stuart*, 547 U.S. 398, 400 (2006). Officers can enter a home without a warrant when there is a need to "render emergency assistance to occupants of private property who are seriously injured or threatened with such injury." *Id.*

Here, Plaintiff argues that "[t]here was no imminent threat of danger" and therefore entry into her home was unconstitutional. Pl. Br. at 14. Plaintiff's argument is not supported by the facts before this Court. Plaintiff had a history of mental illness and texted her therapist

13

indicating that she thought it was a good day to die. *See* Defs. SOF at ¶¶ 9-10, 19. Although

Plaintiff correctly asserts that she was at a public place when Officer Then and Officer Kithcart

first entered her home, there is no indication that Officer Then and Officer Kithcart were aware

that she was not home. Pl. Br. at 14. Plaintiff would not respond to calls from her therapist. *See*

Defs. SOF at ¶ 22. Further, the transcripts provided to this Court show that Officer Then and

Officer Kithcart were notified immediately when the police dispatcher learned that Plaintiff was

not home. Pl. SOF at ¶ 25. Therefore, Officer Then and Officer Kithcart were justified in

entering Plaintiff's home the first time as they could reasonably believe she was present and in

threat of danger to herself.

Plaintiff argues that even if the first entry was justified, there was "no exigency requiring

the Defendants to even return to the home." Pl. Br. at 14. Mr. Leenstra informed the police

dispatcher that Plaintiff had returned home. Defs. SOF at ¶ 30. Although Plaintiff's husband

indicated that she was okay, Officer Then and Officer Kithcart were unable to speak to Plaintiff

directly in order to verify her well-being. *See* Defs. SOF at ¶ 30. Therefore, Officer Then and

Officer Kithcart were justified in entering Plaintiffs home the second time to protect her against a

serious threat of self-injury, and Officer Then and Officer Kithcart are entitled to summary

judgment in their favor. *See Bringham City Utah*, 547 U.S. at 400.

### c.     Using excessive force and restraining Plaintiff

In Counts One and Three of Plaintiff's complaint, Plaintiff alleges that Officer Then and

Officer Kithcart violated Plaintiff's state and federal constitutional rights by using "excessive

force and restraining Plaintiff." Compl. at 9, 11. Police officers are only permitted to use

"reasonable" force in detaining an individual. *See Groman v. Twp. of Manalapan*, 47 F.3d 628,

634 (3d Cir. 1995). The test for reasonableness is objective, but "should give appropriate scope

14

to the circumstances of the police action, which are often 'tense, uncertain, and rapidly evolving.'" *See id.* (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Factors to consider in evaluating the reasonableness of the force are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he actively is resisting arrest or attempting to evade arrest by flight." *Kopec v. Tate*, 361 F.3d 772, 776-77 (3d Cir. 2004). Here, Officer Then and Officer Kithcart restrained Plaintiff, subdued her, and handcuffed her before she was transported to the hospital.

Officer Then and Officer Kithcart initially restrained Plaintiff when she grabbed her coat and walked towards her bedroom door.[10] Defs. SOF at ¶¶ 57, 59 (stating that they interpreted Plaintiff's actions as a "possible attempt to exit the home"). Plaintiff argues that she was retrieving a cellphone from her coat pocket in order to contact her therapist; however, an audio recording of the incident does not contain any evidence supporting this version of the facts.[11] Pl. Br. at 15. Moreover, Officer Then is clearly heard on the recording instructing Plaintiff that she is "not going anywhere." Pl. Res. To Defs. SOF at ¶ 13. Plaintiff posed an immediate threat to her own safety in light of her suicidal statements, and an objectively reasonable person could believe she was attempting to flee and required restraint. *See Groman*, 47 F.3d at 634. Plaintiff's subsequent struggling was met by increased involvement by the officers. Based on the record, Plaintiff has provided no evidence that the amount of force subsequently used by the officers to subdue and handcuff her was unreasonable in light of the circumstances. Therefore,

---

[10] Plaintiff argues that Defendants are "misleading when they claim Linda reached for her jacket in close proximity to an exit from the home." Pl. Br. at 15. Plaintiff does not provide a citation for this statement, and it is inconsistent with the facts set forth by Defendants. Defs. SOF at ¶ 57 (stating that Plaintiff "grabbed her coat from the foot of the bed and moved towards a door").

[11] Plaintiff also argues that "Defendants did not have statutory authority to restrain her as they had not acted in accordance with the strictures of N.J.S.A. § 30:4-27.6 nor the SOP's [sic]." Pl. Br. at 16. As discussed above, these arguments are without merit.

Officer Then and Officer Kithcart applied a reasonable amount of force in preventing her exit from the apartment. *See Kopec*, 361 F.3d at 776-77.

After Officer Then and Officer Kithcart restrained Plaintiff, Plaintiff resumed struggling with the officers. Defs. SOF at ¶ 62. Plaintiff screamed at the officers and kicked both officers on numerous occasions. Defs. SOF at ¶¶ 62, 64. Although Plaintiff denies "intentionally attempting to kick the Defendants," she acknowledges struggling with Officer Then and Officer Kithcart and admits that one of the officers sustained bruising during the confrontation. *See Pl. Resp. to Defs. SOF* at ¶¶ 62, 71, 74. Moreover, Plaintiff was a larger woman, as is reflected in the need to use two sets of handcuffs to restrain her, and posed a flight and personal safety risk. *See Defs. SOF* at ¶ 70. Accordingly, the Court cannot find that the officers' use of force to subdue the Plaintiff was excessive under these circumstances. *See Kopec*, 361 F.3d at 776-77.

Finally, Officer Then and Officer Kithcart handcuffed Plaintiff, and Plaintiff screamed that the officers were "breaking" her shoulder. Defs. SOF at ¶¶ 68, 70. Plaintiff suffered from shoulder tendonitis; however, there is no indication that either officer was aware of this impairment when handcuffing Plaintiff. Defs. SOF at ¶ 69. And, apart from this one statement, there is nothing in the record indicating that Plaintiff was in pain or conveyed her pain or discomfort to the officers. Defs. SOF at ¶ 68. After being handcuffed, Plaintiff asked for the handcuffs to be removed. Defs. SOF at ¶ 78. Although the officers did not comply with that request, the facts show that within three minutes of Plaintiff's request, Officer Then and Officer Kithcart moved Plaintiff's handcuffs to a more comfortable position in front of her body. Defs. SOF at ¶ 78. Objectively, Officer Then and Officer Kithcart's actions in handcuffing Plaintiff were reasonable under the circumstances, and Officer Then and Officer Kithcart are entitled to summary judgment. *See Groman*, 47 F.3d at 634.

16

**d.      Creating a danger and undue risk to Plaintiff's life and limb**

In Count One of Plaintiff's complaint, Plaintiff alleges that Officer Then and Officer

Kithcart unlawfully and unjustifiably created a "danger and undue risk to Plaintiff's life and

limb." Compl. at 9. Plaintiff's complaint contains little factual support for her assertions, but

presumably this claim relates to her statement that,

> [A]s a result of Defendants [sic] conduct, Plaintiff became overwhelmed and
> attempted to call her therapist. Defendants at this time prevented Plaintiff from
> doing so and proceeding in a forceful and unlawful manner to grab Plaintiff and
> push her into a wall, yelling at her and puling at her arms. This resulted in
> Plaintiff descending into a dissociated and psychotic state.

Compl. at 6. Plaintiff later alleges that Officer Then and Officer Kithcart maintained an

"aggressive and antagonistic demeanor" throughout their interaction with Plaintiff, thereby

provoking Plaintiff "into an agitated state." Pl. Br. at 13.

None of Plaintiff's assertions are supported by the facts before this Court. Officer Then

recorded the events of the evening, and the recording does not demonstrate that either officer was

"aggressive" or "antagonistic." *See* Pl. Br. at 13. The record clearly shows that Plaintiff was

"verbally and physically uncooperative, and Plaintiff acknowledges struggling with the officers

during their attempts to restrain her. *See* Defs. SOF at ¶ 62; Pl. Resp. to Defs. SOF at ¶ 62. As

discussed above, Plaintiff's other allegations also fail. Plaintiff's statement that she was

attempting to call her therapist is not supported by the great weight of the evidence before the

Court, and, even if it were, it does not negate the fact that Officer Then reasonably believed she

was attempting to flee. And, as also discussed above, Officer Then and Officer Kithcart's efforts

to prevent Plaintiff from fleeing did not "violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *See Harlow*, 457 U.S. at 818.

Accordingly, Officer Then and Officer Kithcart are entitled to summary judgment in their favor.

*See id.*

### e.   Falsely arresting and imprisoning Plaintiff

In Counts One and Three of her complaint, Plaintiff alleges that Officer Then and Officer Kithcart violated her state and federal constitutional rights by falsely imprisoning Plaintiff. Compl. at 9, 11. The record, however, does not support such a finding. There is sufficient evidence in the record that Plaintiff assaulted Officer Then and Officer Kithcart on more than one occasion. Defs. SOF at ¶¶ 63-64, 71-73. Both officers report having been kicked by Plaintiff, and Defendants provided photographic evidence demonstrating injuries allegedly caused by Plaintiff. Defs. SOF at ¶¶ 64, 74. There are also several statements in the audio recording from the night of the incident where Officer Then and Officer Kithcart note that they had been kicked, and both provided statements indicating that Plaintiff spat on them. Defs. SOF at ¶¶ 63-64, 71-73, 86. Plaintiff even acknowledges spitting on Officer Then and Officer Kithcart. *See* Pl. Resp. to Defs. SOF at ¶ 86. Accordingly, the Court is not persuaded that Officer Then and Officer Kithcart's decision to incarcerate Plaintiff violated a "clear established statutory or constitutional rights of which a reasonable person would have known." *See Harlow*, 457 U.S. at 818. Accordingly, the officers are entitled to summary judgment in their favor.

### f.   Maliciously prosecuting Plaintiff

In Counts One and Three of her complaint, Plaintiff alleges that Officer Then and Officer Kithcart engaged in malicious prosecution in violation of her state and federal constitutional rights. Compl. at 9, 11. To succeed on a malicious prosecution claim under § 1983, a plaintiff "must show that:

 (1) the defendant initiated a criminal proceeding;
 (2) the criminal proceeding ended in plaintiff's favor;
 (3) the proceeding was initiated without probable cause;
 (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and

(5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding."

*Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009).

Here, as discussed above, Officer Then and Officer Kithcart had probable cause to believe that Plaintiff committed a crime, thereby justifying her arrest. Moreover, Officer Then and Officer Kithcart obtained a warrant for Plaintiff's arrest predicated on a finding of "probable cause."[12] *See* Defs. Ex. 24. Accordingly, Plaintiff fails to meet an essential element of *Kossler*,[13] and Officer Then and Officer Kithcart are entitled to summary judgment as to Plaintiff's federal malicious prosecution claim. *See Kossler*, 564 F.3d at 186. The New Jersey Civil Rights Act is analogous to 42 U.S.C. §1983, so Officer Then and Officer Kithcart are also entitled to summary judgment as to Plaintiff's state constitutional claim. *See Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011) ("This district has repeatedly interpreted NJCRA analogously to § 1983").

### g.  Denying Plaintiff the Equal Protection of the Law

In Counts One and Two, Plaintiff alleges that Officer Then and Officer Kithcart denied "Plaintiff the Equal Protection of the Law" in violation of Plaintiff's state and federal civil rights. *See* Compl. at 9-11. "The state standard for equal protection is the same standard that is used under the federal constitution." *Feriozzi Co., Inc. v. City of Alt. City*, 266 N.J. Super 124, 138 n. 2 (1993) (citing *Levine v. Institutions & Agencies Dep. of N.J.*, 84 N.J. 234, 257 (1980)). To succeed on an equal protection claim, a plaintiff must demonstrate that she received "different

---

[12] Plaintiff argues that the proceedings against her were "initiated without probable cause" and attaches a copy of the warrant for her arrest. Pl. br. at 16. This warrant clearly states that "[p]robable cause IS found for the issuance of th[e] complaint." *See* Pl. Ex. N at 1 (emphasis in original). Accordingly, Plaintiff's assertions are misleading at best.
[13] In light of this finding, the Court need not address Plaintiff's argument that the "entire encounter" was "malicious and carried out with the purpose of embarrassing the Plaintiff." *See* Pl. Br. at 17.

treatment from that received by other individuals similarly situated" and "prove the existence of purposeful discrimination." *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (internal quotations omitted).

Here, Defendant concedes that Plaintiff was "transported to the hospital because of her disability." Defs. Br. at 19. However, Plaintiff must still demonstrate "purposeful discrimination," which she fails to do. *See Andrews*, 895 F.2d at 1478. Plaintiff argues that, if "this had been anyone else, the entire matter would have ended after the therapist canceled the welfare check." Pl. Br. at 17. This assertion is not supported by the record before this Court. First, as discussed above, Plaintiff's argument that the therapist cancelled the welfare check is inconsistent with the audio recordings of the therapist's conversation with the police dispatcher. Second, there is substantial evidence in the record demonstrating that Officer Then and Officer Kithcart acted out of concern for Plaintiff's well-being rather than an attempt to discriminate against her. Officer Then and Officer Kithcart went to Plaintiff's home only upon the request of Plaintiff's therapist to conduct a wellness check. *See* Defs. SOF at ¶ 23. The officers asked Plaintiff for clarification regarding her statements. *See* Defs. SOF at ¶¶ 48, 50. And, as discussed above, a reasonable officer would believe that Plaintiff's condition justified involuntary commitment pursuant to N.J.S.A. § 30:4-27.6. Accordingly, Plaintiff's Equal Protection claims cannot survive summary judgment. *See Andrews*, 895 F.2d at 1478.

### h.   Interfering with Plaintiff's substantive due process rights

In Count Two, Plaintiff alleges that Officer Then and Officer Kithcart interfered with Plaintiff's enjoyment of her "substantive due process rights" in violation of her state and federal constitutional rights. Compl. at 10-11. Plaintiff's state and federal due process claims utilize the same standard. *See Nat'l Amusements, Inc. v. Borough of Palmyra*, 843 F. Supp. 2d 538, 544

(D.N.J. 2012). The test is whether the behavior of the governmental officer, as a matter of law, "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).

> Plaintiff argues that,
>
> Continuing to pursue a welfare check after being canceled by the initiating therapist, after ascertaining the [Plaintiff] was safe in a public space, then twice more confirming her safety through law enforcement contact, . . . then to enter her home without exigent circumstances negating the need for a warrant, then antagonizing and instigating her in her own bedroom to create an explosive reaction, then to charge her with crimes after achieving the desired reaction shocks the conscience.

Pl. Br. at 17. Plaintiff's argument is not supported by the facts before the Court. As discussed above, 1) the therapist never cancelled the welfare check; 2) the Andover Police never spoke directly with Plaintiff to verify her well-being; 3) Officer Then and Officer Kithcart entered her home pursuant to a valid exception to the warrant requirement; and 4) probable cause existed to charge Plaintiff with assaulting an officer.[14]

Officer Then and Officer Kithcart entered Plaintiff's home to conduct a welfare check, restrained her when they reasonably believed she was going to flee, and took her to a hospital for a mental health evaluation after she repeatedly exclaimed her desire to die. *See* Defs. SOF at ¶¶ 23, 59, 79, 80. The "State has an interest in preventing suicide." *Washington*, 521 U.S. at 730. Officer Then and Officer Kithcart's actions here in accordance with that interest cannot be said

---

[14] Plaintiff's allegation that Officer Then and Officer Kithcart antagonized her is also not supported by the facts before the Court. *See* Pl. Br. at 14. The facts demonstrate that Plaintiff was "verbally and physically uncooperative." *See* Defs. SOF at ¶ 62. After entering the home, Then calmly asked about Plaintiff's text message, she proclaimed that she was "fucking pissed," and retreated to her bedroom. Defs. SOF at ¶¶ 41-42. Officer Then and Officer Kithcart needed to speak with Plaintiff to evaluate her well-being, and warned her that she could either cooperate or they "can call a rig." Defs. SOF at ¶ 52. (stating "[w]e can go the easy route or I can call a rig."). Plaintiff failed to heed this warning and was taken to the hospital for a mental health evaluation. *See* Defs. SOF at ¶ 80.

to "shock the conscience." *See County of Sacramento*, 523 U.S. at 847.  Accordingly, Plaintiff's

due process claims cannot survive summary judgment.

### i.       Interfering with Plaintiff's privileges and immunities

In Count Two of her Complaint, Plaintiff alleges that Officer Then and Officer Kithcart's

actions deprived Plaintiff of the "privileges and/or immunities secured" by the state and federal

constitutions. Compl. at 10-11.  Plaintiff does not provide any factual support for this assertion.

And, as discussed above, Officer Then and Officer Kithcart's conduct at the time of the events

giving rise to this action does not violate any of Plaintiff's "clearly established statutory or

constitutional rights." *See Harlow*, 457 U.S. at 818.  Officer Then and Officer Kithcart had a

right to enter Plaintiff's home, detain her when they reasonably believed she was attempting to

flee, and take her to the hospital for a mental health evaluation.  In light of these findings, Officer

Then and Officer Kithcart are also entitled to summary judgment as to Plaintiff's privileges and

immunities claim. *See id*.

### j.       Conspiring to falsely arrest, maliciously prosecute, and use excessive force against Plaintiff

Finally, in Count Three of her Complaint, Plaintiff alleges that Officer Then and Officer

Kithcart conspired to violate her "civil rights by falsely arresting Plaintiff, illegally seizing the

person of Plaintiff, maliciously prosecuting Plaintiff, [and] using excessive force." Compl. at 11.

As discussed above, Officer Then and Officer Kithcart's conduct in each of these underlying

"offenses" does not "violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *See Harlow*, 457 U.S. at 818.  Moreover, Plaintiff does

not provide any evidence of an implicit or explicit agreement between Officer Then and Officer

Kithcart to commit any of these alleged violations.[15]  Accordingly, Officer Then and Officer

Kithcart are entitled to summary judgment as to Plaintiff's conspiracy claim.

### 2.      Claims Against Chief Coleman

In Counts One and Three of her complaint, Plaintiff alleges that Chief Coleman failed to

adequately "train and supervise" Officer Then and Officer Kithcart and that he maintained a

"policy, practice, or custom of constitutional violations." *See* Compl. at 48, 12.  For the reasons

that follow, Defendants are entitled to summary judgment on each of these counts.

### a.      Failing to adequately train and supervise

In Counts One and Three of her complaint, Plaintiff claims that Chief Coleman is

responsible for Officer Then and Officer Kithcart's alleged state and federal constitutional

violations because Chief Coleman failed to "train and supervise" his employees and was "grossly

negligent in the supervision of his subordinates." *See* Compl. at 48, 12.  A plaintiff is permitted

to bring a civil rights action against a supervisor, but only if the plaintiff can demonstrate that the

supervisor was personally involved in the "alleged wrongs." *See Rode v. Dellaciprete*, 845 F.2d

1195, 1207 (3d Cir. 1988).  "[L]iability cannot be predicated solely on the operation of

*respondeat superior*." *Id.*  A plaintiff can satisfy the "personal involvement" requirement by

demonstrating either: 1) the parties committing the alleged wrong acted at the personal direction

of their supervising officer; 2) the officer had "actual knowledge and acquiescence, an allegation

that must be made with appropriate particularity," or 3) the supervisor exhibited "intentional

---

[15] A conspiracy is a "combination of two or more persons acting in concert to commit an
unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose."
*Ammlung v. City of Chester*, 494 F.2d 811, 814 (3d Cir. 1974) (citation omitted).  A plaintiff may
present both direct and circumstantial evidence of an agreement to conspire, *Ball v. Paramount
Pictures*, 169 F.2d 317, 319 (3d Cir. 1948), but a "plaintiff will not survive summary judgment if
she bases her claims solely on suspicion and speculation." *Jackson-Gilmore v. Dixon*, No. 04-
03759, 2005 U.S. Dist. LEXIS 28844, *12 (E.D.Pa. Nov. 18, 2005) (citations omitted).

conduct, deliberate or reckless indifference to the [victim's] safety, or callous disregard." *See*

*Rode*, 845 F.2d at 1207; *Davidson v. O'Lone*, 752 F.2d 817, 828 (3d Cir. 1984) (en banc).

Here, even assuming Plaintiff succeeded on her constitutional claims against Officer

Then and Officer Kithcart, Plaintiff's allegations against Chief Coleman fail on their merits.

Plaintiff never alleges, nor do the facts before this Court support, a finding that Officer Then and

Officer Kithcart acted at the direction of Chief Coleman when they allegedly violated Plaintiff's

constitutional rights. *See Rode*, 845 F.2d at 1207.  Moreover, there is no evidence in the record

indicating that Chief Coleman knew and acquiesced to their alleged misconduct or somehow

disregarded the potential for Officer Then and Officer Kithcart to violate Plaintiff's

constitutional rights. *See Rode*, 845 F.2d at 1207; *see also Davidson*, 752 F.2d at 828.  Officer

Then and Officer Kithcart were both in compliance with their required training,[16] and there is no

indication that either were ever subject to a civil rights action or disciplinary action. *See* Defs.

SOF at ¶¶ 98-99.  Therefore, Chief Coleman is entitled to summary judgment in his favor on

Plaintiff's negligent training and supervision claims.

> **b.    Maintaining a policy, practice, or custom of constitutional violations**

In Counts One and Three of Plaintiff's complaint, Plaintiff seeks damages from Chief

Coleman alleging that the "actions of [Officer Then and Officer Kithcart] constituted a policy,

practice, procedure or custom of the Andover Township Police Department in that those actions

---

[16] Plaintiff alleges that Andover Township "was the wild west" when it "came to dealing with welfare checks and implementation of involuntary commitment," but provides no factual support for this argument. *See* Pl. Br. at 18-19.  Plaintiff does not allege that either officer failed to comply with a required training. *See* Pl. Br. at 18-19.  Moreover, she admits that Andover Township had two SOPs on the subject, and each officer was required to "familiarize themselves" with these SOPs in connection with their new-hire orientation. *See* Pl. Br. at 18. Moreover, Plaintiff acknowledges that Officer Then and Officer Kithcart received their required "use of force training in July and November 2008" and "domestic violence training in June 2008." *See* Pl. Resp. to Defs. SOF at ¶¶ 98-99.

are part of a pattern of failing to implement standard police practice and/or procedure in dealing with mentally ill individuals during police investigations." Compl. at 9, 12.  Government officials "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  To succeed on a claim, however, a plaintiff must demonstrate that the practice is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691.

Here, even assuming Plaintiff's constitutional claims against Officer Then and Officer Kithcart were allowed to proceed, Plaintiff's broad accusations against Chief Coleman fall well short of the burden set forth in *Monell. See id.* at 690-91.  Plaintiff does not provide any evidence of a "permanent and well settled" custom of permitting discrimination against the mentally ill. *See id.* at 691.  In fact, Plaintiff does not offer even one other instance of discrimination in support of her claims.  Plaintiff's remark that there is a "pattern of failing to implement standard police practice and/or procedure in dealing with the mentally ill" is insufficient to salvage her claim, as it is not supported by the facts before the Court. *See* Compl. at 9.  The police department has two Standard Operating Procedures ("SOP") specifically addressing the mentally impaired—a "1989 SOP captioned 'Mental Health'" and a "1991 SOP captioned 'Involuntary Commitments.'" Defs. SOF at ¶ 92.  In addition, police officers are required to attend "semi-annual training in use of force and domestic violence." Defs. SOF at ¶ 94.  Accordingly, Plaintiff's claims have no factual basis, and Defendants are entitled to summary judgment in their favor.

### 3.    Claims Against Andover Township

In Counts One and Three, Plaintiff alleges that Andover Township failed to adequately "train and supervise" its employees and "created and/or permitted a policy or custom under which constitutional practices occurred as evidenced by, *inter alia*, the affirmative conduct of Defendants." Compl. at 9-10, 12. Defendants argue that Plaintiff's constitutional claims against Andover Township fail because the "plaintiff has not brought forth sufficient evidence to meet the standard[s]" of *Simmons v. City of Philadelphia* and *Monell v. Dep't of Social Servs*. Defs. Br. at 23. For the reasons set forth below, the Court agrees.

### a.   Failing to adequately train and supervise

Plaintiff alleges that Andover Township "failed to train and supervise [its] employees" and was "grossly negligent in [its] supervision." *See* Compl. at 9-10, 12. Specifically, Plaintiff claims that Andover Township made Chief Coleman a policymaker, and that Chief Coleman failed to implement a "sound ongoing training and/or refresher mechanism to ensure Andover Township Police officers are familiar with and versed [in] SOP's [sic] and New Jersey Statutes concerning involuntary commitment of the mentally disturbed." Pl. Br. at 20. A municipality is only liable for failing to properly train its officers under very limited circumstances. *See Simmons v. City of Philadelphia*, 947 F.2d 1042, 1060 (3d Cir. 1991). A plaintiff must demonstrate that: 1) a city policymaker made a "deliberate choice to follow a course of action . . . made from among various alternatives;" and 2) the policymaker's choice reflects a "deliberate indifference to the constitutional rights" of the plaintiff. *See id*. (internal quotations omitted).

Here, Plaintiff has not met her obligations under *Simmons* and *Monell*. Plaintiff did not present any evidence demonstrating that Chief Coleman, or any other policymaker, made a choice not to train or supervise Officer Then and Officer Kithcart, nor did so with "deliberate indifference." *See id*. As discussed above, Andover Township has two SOPs on mental

26

impairments—one entitled "Mental Health" and the other "Involuntary Commitments."

Moreover, Andover Township requires police officers to undergo annual use of force training.

*See* Defs. SOF at ¶ 98.  There is no indication in the record that Officer Then or Officer Kithcart

failed to comply with their required training on these topics, nor is there any indication that

either officer had a propensity for committing constitutional violations, which could foreseeably

warrant additional training. *See* Defs. SOF at ¶¶ 98-99.  Accordingly, Defendants correctly

assert that Plaintiff's "training and supervision claims fail under *Simmons*." *See Simmons*, 947

F.2d at 1060.

### b.  Maintaining a policy, practice, or custom of constitutional violations

Plaintiff alleges that Andover Township "created and/or permitted a policy or custom

under which unconstitutional practices occurred." *See* Compl. at 10, 12.  A plaintiff is permitted

to bring suit against a local municipality under the federal and New Jersey civil rights acts. *See*

*Monell*, 436 U.S. at 690-91 (stating that Congress intended "local government units to be

included among those persons to whom § 1983 applies"); *see also Trafton*, 799 F. Supp. 2d at

443-44 (stating that the New Jersey Civil Rights Act is analogous to 42 U.S.C. § 1983).  This

cause of action is limited—a plaintiff may not sue a municipality "for an injury inflicted solely

by its employees or agents." *See Monell*, 436 U.S. at 694.  Instead, a plaintiff must demonstrate

that the constitutional deprivation was caused by a "custom," although the custom need not be

formally approved. *Id*. at 690-91 (holding that a municipality "may be sued for constitutional

deprivations visited pursuant to governmental 'custom' even though such a custom has not

received formal approval through the body's official decision-making channels.").

Here, Defendants are entitled to summary judgment in their favor for two reasons.  First,

as discussed above, Plaintiff has not established any underlying "constitutional deprivation" on

27

which to base her claims against Andover Township. *See id.* at 690-91.  Second, even if Plaintiff

did meet this burden, the facts do not support a finding that any policy, practice, or custom

caused such a violation.[17]  *See id.*  On the contrary, there is substantial evidence on the record

demonstrating the strength of Andover Township's mental health policies and customs.  Andover

Township has two long standing SOPs specifically designed to address mental illness.  *See* Defs.

SOF at ¶ 92.  One of the SOPs states that its purpose is to "establish uniform procedures for . . .

police personnel in dealing with mentally disturbed people in need of psychiatric commitment."

Defs. Br. at 26.  Officer Then testified that he received copies of Andover Township's policies

regarding the mentally ill, and Officer Kithcart testified that he received training on the subject at

the police academy.  *See* Kithcart Dep. at 24:2-26:17; Then Dep. at 28:4-29:22.

      The only evidence Plaintiff provides suggesting any weakness in Andover Township's

policies is a report by Plaintiff's expert witness, James Williams.  *See* Pl. Br. at 19-20.  In

Williams' report, Williams concluded that Andover Township failed to comply with a New

Jersey mandate requiring Andover Township to provide annual training programs in "Verbal and

Non-Verbal Communications," which Williams explained would include instructions on "how to

handle persons in situations of this case incident."  *See* Williams Report at 15.  Williams'

findings are not supported by the facts before this Court.  The New Jersey Attorney General

Guidelines "do not mandate specific, ongoing training in communication with the mentally ill."

Defs. Br. at 27 (citing Defs. Expert Report at 28); *see also* Defs. Ex. 33 (listing the two

---

[17] Plaintiff again argues that Andover Township maintained a "custom and practice of not
implementing a sound ongoing training and/or refresher mechanism to ensure Andover
Township Police officers are familiar with and versed [in] SOP's [sic] and New Jersey Statutes
concerning involuntary commitment of the mentally disturbed."  Pl. Br. at 20.  However, as
discussed above, there is no evidence that additional training programs were warranted.
Moreover, there is no evidence that any such inadequacy in the training program created a policy
or custom under which unconstitutional practices occurred.

mandatory in-service trainings—use of force and domestic violence). The only mandated annual trainings are in "use of force" and domestic violence. Defs. Ex. 33. Officer Then and Officer Kithcart complied with both. *See* Defs. SOF at ¶¶ 98-99. Accordingly, Williams' testimony is "pure speculation" and is not persuasive. *See Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996). Defendants are entitled to summary judgment in their favor.

### B.    Count Four – False Imprisonment/False Arrest

In Count Four, Plaintiff alleges that "Defendants wrongfully, unlawfully, maliciously, and without any warrant or pretense of legal process, detained, restrained, arrested and confined Plaintiff against her will." Compl. at 13. Plaintiff seeks damages under theories of "false imprisonment and false arrest," which are "merely separate names for the same tort." *See* Compl. at 13; *see also Roth v. Golden Nugget Casino/Hotel, Inc.*, 576 F. Supp. 262, 265 (D.N.J. 1983) (citing *Price v. Phillips*, 90 N.J. Super. 480, 484 (App. Div. 1966). As discussed above, Plaintiff was detained on two separate occasions. First, she was taken to the hospital for a mental health evaluation. Second, she was arrested for assaulting Officer Then and Officer Kithcart and was transported to a county jail. Defendants allege that one of the two defenses to an action for false imprisonment—legal justification or probable cause—is applicable to each of these arrests. Defs. Br. at 30 (citing *Hayes v. Mercer County*, 217 N.J. Super. 614, 623 (App. Div. 1987)). The Court agrees.

Plaintiff's first arrest was "legally justified." *See Hayes*, 217 N.J. Super. at 623. Officer Then and Officer Kithcart are allowed to take "custody of a person and take the person immediately and directly to a screening service if . . . [o]n the basis of personal observation, the law enforcement officer[s] [have] reasonable cause to believe the person is in need of involuntary commitment to treatment." *See* N.J.S.A. § 30:4-27.6. Here, as discussed in greater

detail *supra*, Officer Then and Officer Kithcart had reasonable cause to believe Plaintiff was in need of involuntary commitment. Accordingly, Officer Then and Officer Kithcart were legally justified in arresting Plaintiff. *See Hayes*, 217 N.J. Super. at 623. *See also* N.J.S.A. § 30:4-27.7 (granting immunity to officers "acting in good faith . . . who take[] reasonable steps to assess, take custody of, detain or transport an individual for the purposes of mental health assessment or treatment.").

Plaintiff's second arrest was pursuant to "probable cause." *See Hayes*, 217 N.J. Super. at 623. As discussed above, it is unclear whether a judge issued a warrant for Plaintiff's arrest before or after she was taken into custody. Nonetheless, the arresting officer had "probable cause" to believe she had committed a crime—assaulting Officer Then and Officer Kithcart—thereby permitting her warrantless arrest. *See Hayes*, 217 N.J. Super. at 623; *see also Devenpeck*, 543 U.S. at 152 (stating that a warrantless arrest is permissible where the arresting officer has probable cause to believe the person committed a crime). Accordingly, Defendants are entitled to summary judgment in their favor as to Count Four of Plaintiff's complaint.

## C.    Count Five – Civil Conspiracy

In Count Five of her complaint, Plaintiff alleges that Defendants engaged in a "civil conspiracy to subject Plaintiff to arrest, false imprisonment and or malicious prosecution." *See* Compl. at 14. Plaintiff explains that "Then and Kithcart and dispatcher Joyce Covalence conspired to first embarrass [Plaintiff] at a public event, and the [sic] thereafter to create an unnecessary risk of conflict by continuing to pursue a welfare check that had been canceled."[18] Pl. Br. at 22. In New Jersey, a civil conspiracy claim consists of four elements, 1) two or more people; 2) proof that the people are acting in concert pursuant to a real agreement; 3) the

---

[18] As discussed above, Plaintiff's assertion that the welfare check was canceled is not supported by the evidence before this Court.

30

existence of a purpose to "commit an unlawful act, or to commit a lawful act by unlawful means;" and 4) damages. *See Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177 (2005).

Here, Plaintiff alleges each of the elements of civil conspiracy but does not provide any material facts in support of these claims. *See* Compl. at 13-14. For example, there is no evidence supporting Plaintiff's assertion that Defendants reached an agreement or acted with the unlawful purpose of subjecting Plaintiff to embarrassment, "false arrest, false imprisonment and or malicious prosecution." *See Banco Popular N. Am.*, 184 N.J. at 177. There simply is no evidence of an agreement, express or implied, between Officer Then, Officer Kithcart, or Joyce Covalence. Accordingly, Defendants are entitled to summary judgment in their favor on Count Five of Plaintiff's complaint. *See Banco Popular N. Am.*, 184 N.J. at 177.

### D.      Count Six – New Jersey Tort Claims Act

In Count Six of the complaint, Plaintiff alleges that Andover Township is liable for the actions of its employees pursuant to the New Jersey Tort Claims Act. *See* Compl. at 14-15. N.J.S.A. 59:2-2 provides that a "public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment." *See Wright v. State*, 169 N.J. 422, 450 (2001). "The primary liability imposed on public entities is that of *respondeat superior*." *Tice v. Cramer*, 133 N.J. 347, 355 (1993). If an officer is liable for acts within the scope of his employment, so is the entity; conversely, when the officer is not liable, "neither is the entity." *See id.* Moreover, an officer is not liable for the underlying offense when they are protected by an "immunity provided by law." *See id.* (internal quotations omitted).

Here, Defendants are entitled to summary judgment on each of Plaintiff's first five counts. Plaintiff's claims either failed on their merits or were prohibited by virtue of a state or federal immunity. The individual defendants are not liable to the Plaintiff for any of her alleged

damages.  If the individual defendants cannot be held liable, then Andover Township cannot be liable under *respondeat superior*. "[W]hen the public employee is not liable, neither is the entity." *Id*.  Accordingly, Defendants are entitled to summary judgment in their favor on Count Six of Plaintiff's complaint.

I.       **CONCLUSION**

      For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in its entirety.  An appropriate Order accompanies this Opinion.


DATED: February 21, 2013                              _____
                                                      JOSE L. LINARES
                                                      UNITED STATES DISTRICT JUDGE